**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**HOSPICE OF PALM BEACH COUNTY,**
**INC.,**

                **Plaintiff,**

**v.**                                 Case No.  9:24-cv-80963

**XAVIER BECERRA, in his official**
**capacity as Secretary of the United States**
**Department of Health & Human Services,**

                **Defendant.**

## COMPLAINT FOR JUDICIAL REVIEW OF ADMINISTRATIVE DECISION

Plaintiff HOSPICE OF PALM BEACH COUNTY, INC. (the "Hospice"), by and through its undersigned counsel, files this Complaint against Defendant XAVIER BECERRA, in his official capacity as the Secretary of the United States Department of Health and Human Services (the "Secretary"), seeking judicial review of the decision rendered by the Administrative Law Judge ("ALJ") of the Office of Medicare Hearings and Appeals ("OMHA") in OMHA case number 3-12955717715 and in relation to Medicare Appeals Council ("Council") docket number M-24-2103.

## PARTIES

1.      The Hospice is a Florida corporation with its principal place of business located at 5300 East Avenue, West Palm Beach, Florida 33407.

2.      At all times relevant hereto, the Hospice was a Medicare-certified company offering hospice services in Florida.

3.      Defendant, Xavier Becerra, is the Secretary of the United States Department of Health and Human Services ("HHS") and the proper defendant in this action pursuant to 42 C.F.R. § 405.1136(d)(1).

## JURISDICTION AND VENUE

4.      This action arises under the United States Constitution, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq*. ("Medicare Act"), and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (the "APA").

5.      Prior to filing this Complaint, the Hospice filed appeals and received determinations as to all issues presented below. The Council did not issue a final decision or dismissal order or remand the case to the ALJ within 90 calendar days of receipt of the Hospice's Request for Review. *See* 42 C.F.R. § 405.1100(c). Accordingly, on May 31, 2024, the Hospice properly requested that the appeal be escalated to federal district court as permitted by 42 C.F.R. § 405.1132(a).

6.      The Hospice has thus exhausted all administrative appeals and has no administrative remedy available to it. The ALJ's decision is, therefore, the final administrative and is appealable to this Court under 42 C.F.R. § 1395ff(b), 42 C.F.R. § 405.1132, and 42 C.F.R. § 405.1136.

7.      On June 13, 2024, the Council issued an order granting the Hospice's request for escalation. This Complaint is timely filed within 60 calendar days after the Hospice received the Council's order. See 42 C.F.R. § 405.1132(b).

8.      Jurisdiction is proper pursuant to 28 U.S.C. § 1331, which vests federal district courts with "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States," and 42 U.S.C. § 1395ff(d), which authorizes judicial review of the ALJ's decision.

9.      Venue is proper pursuant to 42 U.S.C. § 1395ff(b) and 42 C.F.R. § 405.1136(b)(1), as the Hospice's principal place of business is located in this judicial district.

10.     The amount in controversy exceeds the threshold amount of $1,840.00 for judicial review set forth in 88 Federal Register 67297 (effective Jan. 1, 2024).

## LEGAL FRAMEWORK: PROCEDURAL DUE PROCESS

11.     The Fifth and Fourteenth Amendments of the U.S. Constitution guarantee rights to procedural due process. *See* U.S. Const. amend. V; U.S. Const. amend. XIV, § 1.

12.     Procedural due process constrains "governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

13.     To demonstrate a violation of procedural due process rights, a plaintiff must show "(1) 'a deprivation of a constitutionally-protected liberty or property interest'; (2) 'state action'; and (3) 'constitutionally inadequate process.'" *Worthy v. City of Phenix City*, 930 F.3d 1206, 1223 (11th Cir. 2019) (quoting *Cryder v. Oxendine*, 24 F.3d 175, 177 (11th Cir. 1994)).

14.     To have a constitutionally protected property interest in a benefit, a person must clearly have "a legitimate claim of entitlement to it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972).

15.     As this Court has recognized, health care providers and suppliers have a due process property interest in Medicare funds subject to demands to recover overpayments based on extrapolation from statistical sampling. *See MedEnvios Healthcare, Inc. v. Becerra*, No. 23-20068-CIV, 2024 WL 1252264, at *2-3 (S.D. Fla. Mar. 25, 2024) (citing *Zen Grp., Inc. v. Agency for Health Care Admin.*, 80 F.4th 1319, 1326 (11th Cir. 2023)).

16.     To determine whether the procedures at issue were constitutionally adequate, courts consider: (1) the private interest affected, (2) the government's interest, and (3) the risk of erroneous deprivation of the private interest under the procedures used. *Mathews*, 424 U.S. at 335.

17.     Hospices are statutorily entitled to be paid for services provided to Medicare beneficiaries that meet Medicare program requirements. *See* 42 U.S.C. § 1395f.

18.     The Health Care Financing Administration ("HCFA"), the predecessor to the Centers for Medicare and Medicaid Services ("CMS"), has indicated that when challenging the use of statistical sampling to project overpayments, providers can vindicate their rights to procedural due process only if they have a "full opportunity to demonstrate that the overpayment determination is wrong." Health Care Fin. Admin., Use of Statistical Sampling to Project Overpayments to Medicare Providers and Suppliers, Ruling No. 86-1 (Feb. 20, 1986).

## LEGAL FRAMEWORK: THE MEDICARE HOSPICE BENEFIT

19.     The Medicare Hospice Benefit is a benefit under Medicare Part A, a 100% federally subsidized health insurance program. It is administered by CMS on behalf of HHS. The Medicare Hospice Benefit pays a predetermined fee, based on the level of care provided by the hospice provider, for each day an eligible individual receives hospice care.

20.     Through the Medicare Hospice Benefit, Medicare covers reasonable and necessary hospice services provided to eligible individuals. Services available under the Medicare Hospice Benefit are "comprehensive" and include (a) nursing care and services provided by or under the supervision of a registered nurse; (b) medical social services provided by a qualified social worker under the direction of a physician; (c) physician services; (d) counseling services, including bereavement, dietary, and spiritual counseling; (e) short-term inpatient care; (f) medical supplies, including drugs and biologicals; (g) home health aide / homemaker services; and (h) physical,

respiratory, occupational, and speech therapy services. 42 C.F.R. § 418.202; *see also* 42 C.F.R. § 418.3; 42 U.S.C. § 1395x(dd).

21.     To receive the Medicare Hospice Benefit, an eligible individual must file an election statement acknowledging that they have "been given a full understanding of the palliative rather than curative nature of hospice care, as it relates to the individual's terminal illness and related conditions." 42 C.F.R. § 418.24. Palliative care is "patient and family-centered care that optimizes quality of life by anticipating, preventing, and treating suffering[;]…addressing physical, intellectual, emotional, social, and spiritual needs[;] and…facilitat[ing] patient autonomy, access to information, and choice." 42 C.F.R. § 418.3. The election statement must also acknowledge that "certain Medicare services" are waived by the election, namely "Medicare services that are related to the treatment of the terminal condition for which hospice care was elected or a related condition," except for services provided by the designated hospice or the individual's attending physician. 42 C.F.R. § 418.24; *see also* 42 U.S.C. § 1395y(a)(1)(c) ("[N]o payment may be made…for any expenses incurred for items or services…in the case of hospice care, which are not reasonable and necessary for the palliation or management of terminal illness."). Hospice patients are free to revoke the election of the Medicare Hospice Benefit at any time and for any reason. 42 C.F.R. § 418.28.

22.     Hospices are required to provide patients who elect the Medicare Hospice Benefit everything those patients would normally receive on a fee-for-service basis for palliation of their terminal illnesses and related conditions (*e.g.*, medications, physician visits, durable medical equipment, etc.), *including* things Medicare would have otherwise paid for had the patients not elected hospice. *See* 142 Cong. Rec. S9582 (daily ed. Aug. 2, 1996) (statement of Sen. Breaux)

(Congress has confirmed that, absent hospice care, the government is otherwise required to pay for "whatever palliative services are needed to manage [the patient's] terminal illness.").

23.     The government conditions reimbursement to providers of hospice services on a certification of hospice eligibility. 42 U.S.C. § 1395f. The Medicare Hospice Benefit is organized around benefit periods, *i.e.*, two 90-day benefit periods followed by an unlimited number of 60-day benefit periods. 42 U.S.C. § 1395d(a)(4). The hospice provider must obtain a written certification that the individual is terminally ill (a "CTI") "at the beginning of [each benefit] period" and "before it submits a claim for payment." 42 U.S.C. § 1395f(a)(7)(A); 42 C.F.R. § 418.22. For the initial 90-day benefit period, a hospice provider must obtain a CTI from (1) the hospice's medical director or a physician in the hospice interdisciplinary group (a "Hospice Physician"), and (2) the individual's designated attending physician (the "Designated Attending") (if any). For all subsequent benefit periods, a CTI need only be obtained from a Hospice Physician. 42 U.S.C. § 1395f(a)(7)(A)(ii).

24.     Given the nuances and complexities involved in prognostication, as described below, Congress and CMS have entrusted physicians with the responsibility to determine whether a patient's overall condition meets the definition of "terminally ill." 42 U.S.C. § 1395f(a)(7); 70 Fed. Reg. 70532, 70539 (Nov. 22, 2005) ("It is the physician's responsibility to assess the patient's medical condition and determine if the patient can be certified as terminally ill."). An individual is "terminally ill" when the Designated Attending (if applicable) and a Hospice Physician exercise their clinical judgment to conclude that "the individual has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course." 42 U.S.C. § 1395x(dd)(3)(A); 42 C.F.R. § 418.3. A "life expectancy" of 6 months or less means that, in the clinical judgment of the Designated Attending (if applicable) and/or Hospice Physician, the individual's clinical status

at the time of certification is more likely than not (*i.e.*, a probability of > 50%) to result in death within six months based on the normal course of the individual's illness. 42 C.F.R. § 418.3.

25.     A certifying physician's eligibility determination, as memorialized in the CTI, is clinically deficient only if no reasonable physician, applying clinical judgment, could have concluded that the patient was eligible for the Medicare hospice benefit. *See United States v. AseraCare, Inc.*, 938 F.3d 1278 (11th Cir. 2019).

26.     Several changes have been made to the Medicare Hospice Benefit over the years to ensure that Designated Attendings and Hospice Physicians who complete CTIs ("Certifying Physicians") are closely involved in evaluating individuals to predict prognosis and determine eligibility. *See, e.g.*, 75 Fed. Reg. 43236 (July 23, 2010). For example, CTIs must now include a narrative description of the individual ("CTI Narrative") and an attestation "confirm[ing] that [the Certifying Physician] composed the narrative based on his/her review of the patient's medical record or, if applicable, his/her examination of the patient." 42 C.F.R. § 418.22(b)(3)(iii). Additionally, CTIs for all 60-day benefit periods must be preceded by a "face-to-face encounter" ("F2F") in which a Hospice Physician or hospice nurse practitioner visits an individual to gather clinical findings to determine their continued eligibility for hospice care. Certifying Physicians must explain, in the CTI Narrative, why the F2F clinical findings support a life expectancy of six months or less. 42 C.F.R. §§ 418.22(a)(4) and (b)(3)(v).

27.     When Certifying Physicians evaluate an individual's eligibility for hospice, they look at *prognosis*, not diagnosis. 78 Fed. Reg. 48234, 48245 (Aug. 7, 2013) ("[E]ligibility for hospice services under the [Medicare Hospice Benefit] has always been based on the prognosis of the individual, not [the] diagnosis."). Prognosis takes into account diagnoses and all other factors related to an individual's life expectancy. 78 Fed. Reg. 48234, 48245–46; *see also* 79 Fed. Reg.

7

50452, 50469 (Aug. 22, 2014) ("[T]he individual's whole condition plays a role in that prognosis."). Thus, Certifying Physicians "must consider the primary terminal condition, related diagnoses, current subjective and objective medical findings, current medication and treatment orders, and information about unrelated conditions when considering the initial certification of the terminal illness." 73 Fed. Reg. 32088, 32138 (June 5, 2008); *see also* 42 C.F.R. § 418.25(b) ("In reaching a decision to certify that the patient is terminally ill, the hospice medical director must consider at least the following information: (1) Diagnosis of the terminal condition of the patient; (2) Other health conditions, whether related or unrelated to the terminal condition; (3) Current clinically relevant information supporting all diagnoses.").

28.     While a prognosis of a life expectancy of six months or less is a necessary condition for reimbursement, Congress has acknowledged that "[p]redicting life expectancy is not an exact science." *See* 142 Cong. Rec. S9582 (daily ed. Aug. 2, 1996) (statement of Sen. Breaux); *see also* 75 Fed. Reg. 70372, 70488 (Nov. 17, 2010). The phrase "if the illness runs its normal course" in the definition of "terminal illness" is an important recognition by CMS that a physician's determination of patient prognosis cannot, nor need not, be a certainty. *See* 55 Fed. Reg. 50831, 50832 (Dec. 11, 1990) (citing Government Accounting Office, *Program Provisions and Payments Discourage Hospice Participation* (Sept. 29, 1989)). CMS has also recognized that there will be variability in lengths of stay because "individuals vary in their responses to illness and care," and it is not "feasible or prudent to specify or predetermine what lengths of stay should or must be achieved to measure or evaluate the effectiveness of care provided." *See* 72 Fed. Reg. 50214, 50222 (Aug. 31, 2007). Therefore, "[t]he fact that a beneficiary lives longer than expected in itself is not cause to terminate benefits." Medicare Benefit Policy Manual, CMS Pub. No. 100-02, Ch. 9, § 10.

29.     The current Medicare framework does not preclude reimbursement for periods of hospice care that extend beyond six months. There used to be a 210-day statutory limit on hospice care, but Congress removed that limitation in 1989 in recognition of the uncertainty of prognosis. *See* 42 U.S.C. § 1395d(d)(1) (establishing that hospice providers may collect reimbursement for an unlimited number of benefit periods); *see also* Medicare Catastrophic Coverage Repeal Act of 1989; 70 Fed. Reg. 70532, 70533 (Nov. 22, 2005). In a Program Memorandum to Intermediaries/Carriers, CMS has stated:

> Recognizing that prognoses can be uncertain and may change, Medicare's benefit is not limited in terms of time. Hospice care is available as long as the patient's prognosis meets the law's six-month test. This test is a general one. As the governing statute says: "The certification of terminal illness of an individual who elects hospice shall be based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness." CMS recognizes that making medical prognostication of life expectancy is not always an exact science. ***Thus, physicians need not be concerned. There is no risk to a physician about certifying an individual for hospice care that he or she believes to be terminally ill***.

Program Memorandum Intermediaries/Carriers, Subject: Provider Education Article, CMS-Pub. 60AB (Mar. 28, 2003) (quoting 42 U.S.C. § 1395f(a)(7)) (emphasis added). CMS also has made this point clear in its guidance manuals, stating that "[t]he fact that a beneficiary lives longer than expected in itself is not cause to terminate benefits." Medicare Benefit Policy Manual, CMS Pub. No. 100-02, Ch. 9, § 10.

30.     CMS has not created clinical benchmarks that must be satisfied to certify a patient as terminally ill. In 2008, CMS announced a rule specifying the information a Certifying Physician "must consider" in making an initial certification. *See* 42 C.F.R. § 418.102(b). CMS initially proposed labeling the considerations "criteria," but removed that word, explaining:

> In the proposed rule, we called [the considerations] "criteria," and we believe that this term may have been the source of commenter concern. Our intent was to ensure that medical directors carefully examine all relevant information that is gathered about the patient before making [an eligibility] determination…. ***We have removed***

*the term "criteria" in order to remove any implication that there are specific CMS*
*clinical benchmarks in this rule that must be met in order to certify terminal*
*illness.*

73 Fed. Reg. 32088, 32138 (June 5, 2008) (emphasis added).

31.     CMS has recognized that terminally ill patients can experience periods without

observable decline and periods with apparent stabilization—and that neither necessarily negate a

terminal prognosis:

> [B]eneficiaries in the terminal stage of their illness that originally qualify for the
> [Medicare Hospice Benefit] but stabilize or improve while receiving hospice care,
> yet have a reasonable expectation of continued decline for a life expectancy of less
> than 6 months, remain eligible for hospice care. The [Certifying Physician] must
> assess and evaluate the full clinical picture of the Medicare hospice beneficiary to
> make the determination whether the beneficiary still has a medical prognosis of 6
> months or less, regardless of whether the beneficiary has stabilized or improved.

*See* 79 Fed. Reg. 50452, 50471 (Aug. 22, 2014) (emphasis added); *see also* 75 Fed. Reg. 70372,

70448 (Nov. 17, 2010) ("A patient's condition may temporarily improve with hospice care."); 74

Fed. Reg. 39384, 39399 (Aug. 6, 2009) ("We also acknowledge that at recertification, not all

patients may show measurable decline."); Palmetto GBA ("Palmetto"), Hospice Coalition

Questions and Answers (Sept. 23, 2008) ("[t]here is no requirement that 'significant documented

decline' must be included" to substantiate that a patient has a terminal prognosis). Based on CMS

guidance, a federal district court has excluded proposed expert testimony alleging that an

individual must show decline to remain eligible for hospice. *See Vista Hospice Care*, No. 3:07-

CV-00604-M, 2016 WL 3449833, at *15 (N.D. Tex. June 20, 2016) (citing 79 Fed. Reg. 50452,

50471 (Aug. 22, 2014)). Moreover, CMS has acknowledged that a perceived improvement or

stabilization (*i.e.*, an apparent lack of decline) in symptoms may not mean that an individual's

*prognosis* (on which hospice eligibility is based) has changed, and it can be difficult to distinguish

a sustainable stabilization from the *impression* of stabilization that could not be maintained if the

patient were to be discharged from hospice. *See* 70 Fed. Reg. 70532, 70540 (Nov. 22, 2005); *see also* 79 Fed. Reg. 50452, 50471 (Aug. 22, 2014).

32.    Under the Medicare hospice benefit, payment amounts are generally based on one of the following four levels of care:

   a.  Routine Home Care: The patient receives hospice service while "at home and…not receiving continuous care." 42 C.F.R. § 418.302(b)(1).

   b.  Continuous Home Care: During "brief periods of crisis," the patient receives hospice care predominantly consisting of nursing care on a continuous basis while at home. 42 C.F.R. § 418.302(b)(2).

   c.  Inpatient Respite Care: The patient "receives care in an approved facility on a short-term basis for respite" of a personal caregiver. 42 C.F.R. § 418.302(b)(3).

   d.  General Inpatient Care: The patient receives care "in an inpatient facility for pain control or acute or chronic symptom management which cannot be managed in other settings." 42 C.F.R. § 418.302(b)(4).

33.    Hospices may also receive service intensity add-on payments ("SIAs") for routine home care services provided during a patient's last seven days of life. *See* 42 C.F.R. § 418.302(b)(1)(i). An SIA payment equals "the continuous home care hourly payment rate…multiplied by the amount of direct patient care actually provided" by a registered nurse or social worker for up to four hours per day. 42 C.F.R. § 418.302(b)(1)(ii).

34.    CMS contracts with Medicare Administrative Contractors ("MACs"), which are private companies that process and pay Medicare claims on behalf of CMS. MACs issue Local Coverage Determinations ("LCDs"), which are "administrative and educational tools" that give "guidance to the public and medical community" within a specific geographical area in order "to

assist providers in submitting correct claims." *See* CMS Transmittal 608, Medicare Program Integrity Manual, Ch. 13.1.3 (August 14, 2015), available at https://www.cms.gov/Regulations-and- Guidance/Guidance/Transmittals/downloads/R608PI.pdf. Each LCD covers only a specific geographical area.

35.     Hospice LCDs set forth clinical *guidelines* to be considered when assessing an individual's terminality; they do not impose a set of mandatory clinical data-points that must be documented in the medical record to demonstrate a patient's hospice eligibility. LCDs specify different clinical guidelines for assessing patient terminality depending on the patient's overall condition, their primary diagnosis, the presence of secondary and comorbid conditions, and other factors.

36.     LCDs do not and *cannot* establish or change the substantive legal standard for hospice eligibility because LCDs have not gone through the notice-and-comment process outlined at 42 U.S.C. § 1395hh. *See Agendia, Inc. v. Becerra*, 4 F.4th 896, 900 (9th Cir. 2021). Accordingly, eligibility for hospice cannot be limited by LCDs if an individual otherwise satisfies the only valid and substantive legal standard applicable: a determination by a physician of a prognosis of six months or less if the individual's illness runs its normal course. 42 U.S.C. § 1395x(dd)(3)(A); 42 C.F.R. § 418.3. LCDs represent only "*one path* to eligibility under the [Medicare Hospice Benefit], but hospices may 'otherwise demonstrate…that the patient has a terminal prognosis.'" *Vista Hospice Care*, 2016 WL 3449833, at *4).

37.     The application of hospice LCDs to a particular individual's circumstances is a complex clinical analysis that requires the appropriate medical knowledge, skill, experience, and expertise. Hospice LCDs—particularly the Palmetto hospice LCDs that apply here—are flexible and lack the more defined thresholds and exhaustive lists of factors present in the LCDs for other

Medicare items and services. In fact, the Palmetto LCDs explicitly acknowledge that the relevant diagnoses "may support a prognosis of 6 months or less under many clinical scenarios," intentionally giving Certifying Physicians clinical leeway to determine, using clinical judgment, whether the structural and functional impairments and activity limitations associated with a patient's primary hospice diagnosis, together with any secondary and/or comorbid conditions, are such that most individuals with the same or similar impairments would have a prognosis of six months or less. *See, e.g.*, Palmetto's LCDs for Hospice Alzheimer's Disease & Related Disorders (L34567), Hospice - Neurological Conditions (L34547), and Hospice Cardiopulmonary Conditions (L34548).

38.     Because LCDs do not establish substantive legal standards, ALJs are "not bound by LCDs," but must give "substantial deference to [LCDs] if they are applicable to a particular case." 42 C.F.R. § 405.1062(a). If LCDs were rigid, all-or-nothing checklists for eligibility (*i.e.*, if they were to be afforded *complete* deference, rather than just substantial deference), they would need to go through the § 1395hh notice-and-comment process and would interfere with physicians' exercise of clinical judgment. CMS was clear in the promulgation of the final rule passing the "substantial deference" regulatory standard that the standard "does not alter the ALJ's role as an independent fact finder" and should not "lead to adjudicators 'rubber stamping' the previous appeal decision[s]." *See* 74 Fed. Reg. 65296, 65327 (Dec. 9, 2009). LCDs themselves do not conclusively establish what is "reasonable and necessary" but, rather, are intended to serve as a "useful framework" to aid in physician decision-making regarding eligibility and facilitate ALJs'

analysis of the individual facts presented to determine whether services provided were "reasonable and necessary." *See* 70 Fed. Reg. 11419, 11458 (March 8, 2005); 42 U.S.C. § 1395y(a)(1)(A).[1]

39.     Based on CMS commentary, if an individual meets LCD guidelines, then the ALJ must, in substantial deference to the LCD, conclude that the individual is eligible for hospice. *See* 82 Fed. Reg. 4974, 5026 (stating that claims may be "denied in error as a result of [a reviewer's] non-compliance with…authority that is owed substantial deference, such as LCDs."). However, if an individual does not meet LCD guidelines, it does not necessarily follow that the individual is ineligible for hospice. The "substantial deference" standard requires ALJs to utilize LCDs as a basis to *allow* for reimbursement when the guidelines are met but *does not* permit ALJs to deny reimbursement solely because an individual does not squarely fall within LCD guidelines. If, after undertaking an analysis as an independent factfinder, the ALJ determines that an individual does not satisfy LCD guidelines, the ALJ must consider all other relevant factors bearing on prognosis, including those beyond the confines of the LCD, in order to render a decision.

40.     In cases where CMS or its contractors determine that an item or service is not reasonable and necessary, Section 1879 of the Social Security Act (the "Act"), codified at 42 U.S.C. § 1395pp, provides that payment shall nevertheless be made for such items or services if the provider did not know, and could not reasonably have been expected to know, that such items or services would not be covered. This liability limitation provision specifically applies to cases where CMS or its contractors determine that a Medicare hospice beneficiary was not terminally ill. 42 U.S.C. § 1395pp(g)(2).

---

[1] "Reasonable and necessary" is the ultimate standard ALJs are bound by under the Social Security Act for Medicare reimbursement. For hospice specifically, the standard for reimbursement is "reasonable and necessary for the palliation or management of terminal illness." 42 U.S.C. § 1395y(a)(1)(C).

41.     If CMS determines a provider has been overpaid, Section 1870 of the Act, codified at 42 U.S.C. § 1395gg, allows for waiver of recoupment of the overpayment where the provider is deemed to be "without fault" with respect to creating the overpayment. A provider is "without fault" as to the creation of an overpayment, and thus entitled to waiver of recoupment of the overpayment, where it had a reasonable basis for assuming that the payments received were correct.

42.     The Medicare program is administered by the Secretary through CMS which, in turn, contracts with private entities to perform certain functions on its behalf. These functions include, but are not limited to, claims processing for reimbursement submitted by Medicare providers and audits of such claims to ensure that they meet the requirements set forth in the Medicare statute and its implementing regulations.

43.     Medicare claims are processed by MACs. Other CMS divisions or contractors, such as the CMS Center for Program Integrity ("CPI") and Uniform Program Integrity Contractors ("UPICs"), were and are authorized by CMS to audit claims for payment presented to Medicare by health care providers relating to services they provided to Medicare beneficiaries. These audits were and are performed on a post-payment basis to ensure that the claims complied with Medicare coverage and documentation requirements at the time they were submitted for reimbursement.

44.     In addition, HHS's Office of Inspector General ("OIG") audits health care providers that participate in Medicare pursuant to its authority to "conduct and supervise audits and investigations relating to the programs and operations" of HHS, including compliance with Medicare requirements. 5 U.S.C. § 402(b)(1).

45.     However, as the OIG itself has acknowledged in this very case, even when the OIG conducts an audit, CMS remains responsible for determining whether a provider owes an

overpayment and for determining the amount of the overpayment. OIG, *Medicare Hospice Provider Compliance Audit: Hospice of Palm Beach County, Inc.* 7 n.32 (September 2022) ("OIG audit recommendations do not represent final determinations by Medicare. CMS, acting through a MAC or other contractor, will determine whether overpayments exist and will recoup any overpayments consistent with its policies and procedures."). *See also* 42 U.S.C. § 1395kk-1(a)(4)(A) (describing determination of the payment amount as a function of MACs).

46.     If an auditor—whether a CMS division, a CMS contractor, or the OIG—audits and denies a claim, the affected provider may avail itself of an administrative appeal process to contest the claim denial(s). This appeals process consists of five stages: (i) redetermination, (ii) reconsideration, (iii) a hearing before an ALJ, (iv) review by the Council, and (v) judicial review by a federal district court.

47.     Requests for redetermination are processed by MACs. Requests for reconsideration are handled by separate contractors known as Qualified Independent Contractors ("QICs"). Hearing requests are adjudicated by ALJs in OMHA. Requests for review are processed by the Council, which is a component of the HHS Departmental Appeals Board.

### LEGAL FRAMEWORK: STATISTICAL SAMPLING AND EXTRAPOLATION

48.     Extrapolation is permissible only "when claims are voluminous…and when a case-by-case review is not administratively feasible." Health Care Fin. Admin., Ruling No. 86-1 (emphasis added).

49.     Courts have refused to allow extrapolation when it is not the only method available to establish overpayment—for example, when discrete claims can be analyzed and reviewed to determine whether they were billed in error. *See, e.g.*, *U.S. ex rel. Michaels v. Agape Senior Cmty., Inc.*, No. CA 0:12-3466-JFA, 2015 WL 3903675, at *7 (D.S.C. June 25, 2015), order corrected,

2015 WL 4128919 (D.S.C. July 6, 2015), and aff'd in part, appeal dismissed in part sub nom. *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330 (4th Cir. 2017) (citing *United States v. Friedman*, 1993 U.S. Dist. LEXIS 21496 (D. Mass. July 23, 1993)).

50.     CMS sets forth instructions on performing statistical sampling and extrapolation in the Medicare Program Integrity Manual ("MPIM"), CMS Pub. No. 100-08. The purpose of these instructions is "to ensure that a probability sample drawn from the sampling frame of the target population yields a valid estimate of an overpayment in the target population." MPIM § 8.4.1.1.

51.     ALJs are bound by "[a]ll laws and regulations pertaining to the Medicare and Medicaid programs," according to 42 C.F.R. § 405.1063(a). ALJs are not bound by "CMS program guidance, such as program memoranda and manual instructions, but will give substantial deference to these policies if they are applicable to a particular case." 42 C.F.R. § 405.1062(a).

52.     However, because the MPIM has not been promulgated as a regulation by HHS, it cannot "establish[] or change[] a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits" through the Medicare program. 42 U.S.C. § 1395hh(a)(2).

53.     Further, the MPIM itself intends auditors to base their statistical sampling and extrapolation methodology on generally accepted statistical principles as well as the MPIM. *See* MPIM § 8.4.1.5 ("The sampling methodology used in estimations of overpayments must be reviewed and approved by a statistician or by a person with equivalent expertise in probability sampling and estimation methods. This is done to ensure that a statistically appropriate sample is drawn, and that appropriate methods for estimating the overpayments are followed."). The MPIM also lists minimum criteria for these statisticians, including specified combinations of coursework

and years of experience "applying methods of statistical sampling and interpreting the results." *See id.*

54.     The auditor begins the sampling process by drawing from the data set the universe of claims, which consists of claims the provider submitted during the review period. *See* MPIM § 8.4.3.2.1. The universe must include "all claim lines that meet the selection criteria." MPIM § 8.4.3.2.

55.     From the universe, the auditor will next select the sampling frame—a list of "all the possible sampling units from which the sample is selected." MPIM § 8.4.3.2.3.

56.     The auditor then uses a sampling process to choose the sample from the sampling frame. *See* MPIM § 8.4.4.1 (stating that the auditor "shall identify the sampling methodology to be followed").

57.     After the sample is chosen, each claim in the sample is reviewed to determine whether the claim was paid appropriately, underpaid, or overpaid. *See* MPIM § 8.4.6.3 (requiring auditors to document "[t]he amount of all overpayments and underpayments and how they were determined"). These results are used to calculate an error rate.

58.     If extrapolation is used, the error rate is extrapolated across the entire universe to estimate total overpayment amount. *See* MPIM § 8.2.1.1 ("A projected overpayment is the numeric overpayment obtained by projecting an overpayment from statistical sampling for overpayment estimation to all similar claims in the universe under review.").

59.     However, Section 1893(f)(3) of the Act, codified at 42 U.S.C. § 1395ddd(f)(3), prohibits Medicare auditors from using extrapolation unless HHS has determined there is a "sustained or high level of payment error" or failure of educational efforts to correct such errors. Accordingly, MPIM § 8.4.1.2 emphasizes that Section 1893(f)(3) "mandates that *before* using

extrapolation…to determine overpayment amounts…, there must be a determination of sustained or high level of payment error, or documentation that educational intervention has failed to correct the payment error" (emphasis added).

60.    Means of determining a sustained or high level of payment error include:

a.    "high error rate determinations by the contractor or by other medical reviews (i.e., *greater than or equal to 50 percent from a previous pre- or post-payment review*);"

b.    "provider/supplier history (i.e., prior history of non-compliance for the same or similar billing issues, or historical pattern of non-compliant billing practices);"

c.    "CMS approval provided in connection to a payment suspension;"

d.    "information from law enforcement investigations;"

e.    "allegations of wrongdoing by current or former employees of a provider/supplier; and/or"

f.    "audits or evaluations conducted by the OIG." MPIM § 8.4.1.4 (emphasis added).

61.    Under Section 1893(f)(3) of the Act and MPIM § 8.4.1.2, the determination of a high level of payment error is not subject to review. However, Section 1893(f)(3)'s prohibition against review violates providers' due process rights. In another recent case, another provider challenged the Defendant's decision to keep using extrapolation even though the error rate dropped to only 9% after most of the claim denials were overturned, closely mirroring this case. *See Merit Leasing Co. v. Becerra*, No. 1:23 CV 859, 2023 WL 8357441 (N.D. Ohio Dec. 1, 2023). The provider argued that the Defendant's use of extrapolation without giving providers a meaningful process to challenge it violates providers' due process rights. *See id.* The court denied HHS's motion to dismiss. *See id.*

62.     Even if Section 1893(f)(3) did not violate providers' due process rights, neither Section 1893(f)(3) nor MPIM § 8.4.1.2 indicates that the question of *whether the auditor ever made such a determination* before deciding to extrapolate is likewise unreviewable.

63.     Further, under both generally accepted statistical principles and the MPIM, statistical samplings are invalid if they do not result in a probability sample. *See* MPIM § 8.4.2. A probability sample is one in which each sample, and each unit of each possible sample, has "a known probability of selection." *Id.*

64.     Relatedly, auditors must "document all steps taken in the random selection process exactly as done to ensure that the necessary information is available for anyone attempting to replicate the sample selection," MPIM § 8.4.4.2, and "maintain complete documentation of the sampling methodology that was followed," MPIM § 8.4.4.4. This includes documenting the universe definition and elements, period covered, sampling unit definitions and identifiers, dates of service, source, sampling frame, and the random numbers used and how they were selected. MPIM § 8.4.4.4.1. This same section requires that documentation "be kept in sufficient detail so that the sample frame can be re-created should the methodology be challenged." *Id.*

65.     The Medicare Appeals Council has reversed extrapolations because the auditor failed to maintain documentation necessary to replicate the sampling process, emphasizing its importance to providers' due process rights. *See, e.g.*, *Glob. Home Care, Inc.*, M-11-116, at 4 (Medicare Appeals Council Jan. 11, 2011) ("The sampling frame cannot be recreated from the documentation present. Without this basic documentation, a provider does not have the information and data necessary to mount a due process challenge to the statistical validity of the sample, as is its right under CMS Ruling 86-1."); *Podiatric Med. Assocs.*, M-10-230, at 20 (Medicare Appeals Council June 22, 2010) ("It is well-established that due process affords an

appellant provider the right to examine audit results in order to mount a proper challenge in the appeals process….Absent supporting evidence, the appellant is deprived of its ability to review the extrapolation in question.").

66.     The purpose of Medicare program integrity audits is to recover accurate overpayment amounts after accounting for both underpayments and overpayments. *See Maxmed Healthcare, Inc. v. Price*, 860 F.3d 335, 337 (5th Cir. 2017) ("Congress created the Medicare Integrity Program through which the Secretary contracts with private entities 'for the purpose of identifying *underpayments and* overpayments and recouping overpayments[.]'") (citing U.S.C. § 1395ddd(a) and quoting 42 U.S.C. § 1395ddd(h)(1)) (emphases added).

67.     When creating the sampling frame, auditors must include potential underpayments. Ruling No. 86-1, the ruling that CMS points to as establishing its authority to extrapolate, shows that extrapolation must account for all potential underpayments in order to arrive at an accurate overpayment estimate. *See* HCFA, Ruling No. 86-1 ("Section 1815(a) of the Social Security Act, 42 U.S.C. 1395g(a), authorizes 'necessary adjustments on account of previously made overpayments *or underpayments*' under Medicare Part A. Similarly, as to Part B of Medicare, section 1842(a), 42 U.S.C. 1395u(a), provides that carriers make determinations as to the amount of payments to be made to providers of services and other persons, and authorizes such audits of the records as may be necessary to assure that *proper payments* are made. In addition, section 1861(v)(1)(A)(ii) of the Act, 42 U.S.C. 1395x(v)(1)(A)(ii), provides for the 'making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the *aggregate* reimbursement produced by the methods of determining costs proves to be either *inadequate or* excessive.'") (emphases added).

21

68.     Courts have recognized that excluding zero-paid claims from the sampling frame artificially inflates the overpayment estimate. *See, e.g.*, *Cent. Louisiana Home Health Care, L.L.C. v. Price*, No. 1:17-CV-00346, 2018 WL 7888523, at *16 (W.D. La. Dec. 28, 2018) ("The [HHS] interpretation of the MPIM regulations to exclude all unpaid claims clearly results in a substantially higher overpayment calculation. In this case, that amount was recalculated to about $5,000,000 higher.").

69.     Accordingly, many sections of the MPIM require auditors to net underpayments against overpayments when estimating the total overpayment amount. *See*, *e.g.*, MPIM § 8.4.5.2 ("Sampling units that are found to be *underpayments*, in whole or in part, are *recorded as negative overpayments* and *shall be used in calculating the estimated overpayment*.") (emphasis added); MPIM § 8.4.4.4 ("Worksheets shall be used in calculating the *net* overpayment. The worksheet shall include data on the claim number, line item, amount paid, audited value, amount overpaid, reason for disallowance, etc., so that each step in the overpayment calculation is clearly shown. *Underpayments identified during reviews shall be similarly documented*.") (emphases added).

70.     For Corporate Integrity Agreements, the OIG itself has recently begun to explicitly require the inclusion of underpayments to calculate the net overpayment demand. *See* OIG, HHS, Corporate Integrity Agreement Between the Office of Inspector General of the Department of Health and Human Services and CHC-FLA, LLC, App'x B, at 1 (Sept. 26, 2022), https://www.oig.hhs.gov/fraud/cia/agreements/CHC-FLA_Inc_09262022.pdf.

71.     Auditors must also take care in determining the sample size, which has "a direct bearing on the precision of the estimated overpayment." MPIM § 8.4.4.3. Accordingly, the MPIM instructs auditors not to choose a sample size arbitrarily but to consider multiple factors to

determine the sample size. *See id.* ("It is neither possible nor desirable to specify a minimum sample size that applies to all situations.").

72.     Although the MPIM does not set a threshold for an acceptable precision, at the time this audit began, the OIG itself required a precision higher than 25% for its Medicare claim reviews conducted against providers with whom it has Corporate Integrity Agreements, unless the OIG used RAT-STATS or equivalent statistical software to choose the sample size. In addition, another federal district court case invalidated a contractor sampling and extrapolation because the precision of 32.5% was unacceptably high (a higher percentage reflecting a worse precision). *See Central Louisiana Home Health Care, L.L.C. v. Price*, No. 1:17-CV-00346, 2018 WL 7888523, at *20 (W.D. La. Dec. 28, 2018).

## STATEMENT OF FACTS

73.     The Hospice is one of the longest-standing providers of hospice care in Florida and has continuously served hospice patients in the state since its founding in 1978 (*i.e.*, prior to the creation of the Medicare Hospice Benefit). When the Medicare Hospice Benefit was instituted in 1983, the Hospice was one of the first 100 hospices in the country to be certified.

74.     In a letter dated October 17, 2019, the OIG, on behalf of CMS, informed the Hospice of its intention to audit sampled claims related to services provided by the Hospice between April 1, 2017, and March 31, 2019 (the "Audit Period").

75.     On January 21, 2020, the OIG requested medical and billing records from the Hospice pertaining to a "random sample" of 100 claims (totaling ~$402,424.00) out of 37,121 claims (totaling ~$149,850,136.00) the Hospice submitted for payment for services provided during the Audit Period. The Hospice promptly complied with this request and provided the OIG with thousands of pages of responsive records for review.

76.     In a draft report dated April 8, 2022 ("Draft Report"), the OIG informed the Hospice that for 40 of the 100 claims reviewed (totaling $148,856.00), the records did not support: (1) the beneficiaries' terminal prognoses (30 claims); (2) the higher level of care provided (9 claims); and/or (3) the SIA payments received (3 claims). Based on an extrapolation of the sample results, the OIG estimated that the Hospice received $42,336,162.00 in unallowable Medicare reimbursement for hospice services. The Draft Report recommended that the Hospice refund to Medicare the portion of the estimated overpayment amount attributable to the claims that did not meet Medicare requirements and fell within the four-year reopening period.

77.     As part of its review, the OIG determined that the Hospice received $335.57 in improper SIA payments for three claims within the sample. The Hospice investigated and determined that the SIA overpayments resulted from a system error on the part of the MAC (Palmetto) and a technological issue within the Hospice's electronic medical record ("EMR") system. The Hospice promptly addressed the technological issue and, through an internal claim-by-claim review, identified all affected claims within and outside the Audit Period. The Hospice made three voluntary repayments (on April 8, July 28, and September 22, 2022) totaling $798,157.24, which accounted for all SIA overpayments the Hospice mistakenly received due to Palmetto's system error and the Hospice's prior EMR issue (including the $335.57 SIA overpayment identified by the OIG). Given the voluntary repayment, the Hospice excluded the three claims denied for SIA overpayment issues from its continued appeal.

78.     The Hospice responded to the Draft Report in a letter dated July 12, 2022. The response refuted the findings and recommendations set forth in the Draft Report. The Hospice's response included extensive patient clinical summaries prepared by expert hospice physician Stephen A. Leedy, MA, HMDC, FAAHPM, supporting the propriety of 37 claims denied due to

an alleged lack of clinical eligibility for hospice services or because the level of care provided was purportedly not reasonable and necessary. The response also included a report (dated July 8, 2022) prepared by statistical expert R. Mitchell Cox, Ph.D., identifying numerous flaws in the OIG's sampling and extrapolation methodology.

79.     In its final report dated September 23, 2022 ("Final Report"), the OIG maintained the validity of its findings and sampling and extrapolation methodology and restated its original recommendations.

80.     On October 28, 2022, Palmetto issued a demand letter asserting that the Hospice must refund to Medicare an estimated overpayment of $13,011,215. The demand letter included the three claims with SIA overpayments, which had already been repaid, in its calculation of the extrapolated overpayment.

81.     The Hospice initiated an appeal of the OIG's Final Report and Palmetto's demand letter through the Medicare administrative appeals process. On December 20, 2022, the Hospice filed a request for redetermination with Palmetto, seeking review of the 14 denied claims within the four-year reopening period and arguing that, because of the Hospice's voluntary repayment, the three claims denied for SIA reasons should not be included in the demand or used in extrapolation. The redetermination request also included patient clinical summaries updated by Dr. Leedy and a statistical expert report (dated November 14, 2022) revised by Dr. Cox in response to the OIG's Final Report and Palmetto's demand letter.

82.     In its redetermination decision dated February 16, 2023, Palmetto upheld the denial of the 14 appealed claims, but did not address the Hospice's argument that the three claims denied for SIA reasons should be excluded from the extrapolated overpayment.

83.     On May 31, 2023, the Hospice filed a request for reconsideration with C2C Innovative Solutions, Inc. ("C2C"), the QIC, appealing all denied claims and repeating its argument regarding the three claims denied for SIA reasons. The reconsideration request included patient clinical summaries updated by Dr. Leedy, as well as a revised statistical expert report (dated May 18, 2023) and a reply to Palmetto's redetermination decision (dated May 9, 2023) by Dr. Cox.

84.     In its reconsideration decision dated July 28, 2023, C2C upheld the denial of all 14 appealed claims. In response to the Hospice's argument that Palmetto wrongly "included amounts that have already been refunded in the extrapolation calculations" (*i.e.*, the three claims denied for SIA reasons), C2C concluded that "the overpayment calculation should be adjusted to remove any amounts that have already been refunded."

85.     On September 25, 2023, the Hospice filed a request for hearing before an ALJ, seeking review of all remaining denied claims. On October 16, 2023, the Hospice received notice that the appeal would be adjudicated by ALJ Stephanie Martz.

86.     In advance of the scheduled ALJ hearing, on November 22, 2023, the Hospice submitted a position statement to ALJ Martz. The position statement summarized certain relevant legal, medical, and statistical authorities that supported the propriety of the claims at issue and demonstrated the invalidity of the OIG's sampling methodology and extrapolation.

87.     The position statement also included the written testimony of certifying physicians Andres Canova, Aileen Chen, Jennifer Coby, Amy Farbman, Barry Miskin, Ekta Solanki, and Carlos Villalba reaffirming their prior eligibility determinations reflected in the CTIs covering the claims at issue.

88.     In preparation for the ALJ hearing, Dr. Leedy applied his specialized skills and knowledge as a board-certified hospice physician and certified hospice medical director to analyze

the medical records the Hospice previously submitted to the OIG, Palmetto, and C2C. Based on his analysis, Dr. Leedy arrived at an expert opinion concerning whether the medical records supported the conclusions of the certifying physicians that each patient at issue had a "terminal illness" or was eligible for the higher levels of care provided during the dates of service under review (as applicable).

89.    The hearing took place before ALJ Martz on November 30, 2023. No party other than the Hospice appeared at the hearing.

90.    At the hearing, Dr. Leedy provided medical expert testimony on behalf of the Hospice. Hospice Medical Director Katherine Brazzale, MD, FAAFP, FAAHPM, HMDC, and certifying physicians Drs. Chen and Solanki provided supplemental medical opinion testimony. The testifying physicians all opined that the medical records supported that each patient was terminally ill and eligible for hospice services consistent with the level of care received.

91.    Dr. Cox, the only expert statistician to testify, explained how, based on his thorough analysis of the statistical sampling and extrapolation materials received from the OIG and Palmetto, the sampling and extrapolation were statistically invalid.

92.    Amanda Tippin, the Hospice's Corporate Compliance & Privacy Officer, testified regarding the Hospice's reputation and culture of compliance, including its corporate compliance plan, robust policies and procedures related to certification of hospice eligibility, and commitment to providing ongoing compliance training and education to its leadership, physicians, and staff.

93.    On December 26, 2023, ALJ Martz issued a decision (the "Decision") that approved five of the 14 claims. Despite the unrefuted medical opinions of the testifying physicians supporting the propriety of the claims at issue and statistical testimony indicating that the underlying statistical sampling and extrapolation methodology were invalid, the Decision upheld

the denial of the other nine claims and concluded the sampling and extrapolation were valid. The Decision agreed with the Hospice and C2C that the inclusion of the three claims denied for SIA reasons "was grounds to adjust the refund," and the "overpayment amount should be adjusted to account for any favorable determinations below and any refunded payments that have already occurred."

94.     On February 23, 2024, the Hospice submitted to the Council a Request for Review of Administrative Law Judge Medicare Decision seeking review of ALJ Martz's Decision ("Request for Council Review"). In an exhibit to its Request for Council Review, the Hospice provided additional details and examples demonstrating the errors ALJ Martz made in the Decision. That exhibit is attached hereto as Exhibit A and incorporated herein by reference.

95.     With the Request for Council Review, the Hospice also submitted a letter and statistical documentation from Palmetto showing that Palmetto continued to include the three claims denied for SIA reasons in its demand and extrapolation recalculation following the Decision. The Hospice also stated that it intended to submit supplemental statistical expert materials to explain Palmetto's error.

96.     On April 15, 2024, the Hospice submitted the supplemental statistical expert materials prepared by Dr. Cox. Among other things, these materials noted that, as a result of the Decision, the claims error rate dropped to only 9%, taking it below the 10% threshold at which Medicare contractors usually drop their attempts to extrapolate.

## COUNT I: VIOLATION OF THE MEDICARE ACT
## AND ADMINISTRATIVE PROCEDURE ACT

### The ALJ Applied the Incorrect Legal Standards.

97.     The Hospice hereby incorporates by reference paragraphs 1 through 96 herein.

98.     Under the APA, a court reviewing agency action must set aside agency findings that are "not in accordance with law." 5 U.S.C. 706(2)(A). When reviewing agency action, courts must use their own independent judgment to decide questions of law, with no deference to the agency. *See Loper Bright Enterprises v. Raimondo*, No. 22-1219, 2024 WL 3208360, at *12 (U.S. June 28, 2024) (citing 5 U.S.C. § 706).

99.     The failure to apply the correct legal standards or to provide the Court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal.

100.    The ALJ applied incorrect legal standards when she committed errors including, but not limited to, the following:

   a.   Misapplying the legal standard governing hospice eligibility at 42 U.S.C. § 1395x(dd)(3)(A);

   b.   Failing to determine that hospice services for the patients whose claims she denied were reasonable and necessary as defined at 42 U.S.C. § 1395y(a)(1)(C);

   c.   Entirely disregarding the role of physician medical judgment in certifying patients as terminally ill as set forth at 42 U.S.C. § 1395f(a)(7); and

   d.   Committing other errors as described in Exhibit A.

101.    Based on this failure to apply the correct legal standards, the Decision should be reversed.

**The ALJ's Decision Is Not Supported by Substantial Evidence.**

102.    The Hospice hereby incorporates by reference paragraphs 1 through 101 herein.

103.     The ALJ's Decision must be supported by "substantial evidence," and where reliance is placed on one portion of the record in disregard of over-balancing evidence to the contrary, the Court may reverse the Decision.

104.     The unfavorable determinations in the ALJ's Decision were not supported by substantial evidence and were contrary to the overwhelming weight of the evidence, as explained in Exhibit A.

105.     The medical records, the unrefuted medical expert witness testimony provided by Dr. Leedy, and the unrefuted supplemental medical opinion testimony by Drs. Brazzale, Chen, and Solanki show, by a preponderance of the evidence, that the patients had terminal prognoses of six months or less if their illnesses ran the normal course or were eligible for the higher level of care they received.

106.     Without a rational basis, the ALJ disregarded the uncontested opinions of four experienced hospice physicians—the only physicians to testify at the hearing—and improperly made medical conclusions she is unqualified and unauthorized to make regarding the patients' prognoses without the support of any admissible medical opinion evidence.

107.     The ALJ failed to give appropriate weight and deference to the certifying physicians' clinical judgment, despite acknowledgment by Congress and CMS that a hospice physician's role is central to the Medicare Hospice Benefit.

108.     The ALJ's approval of the statistical sampling and extrapolation was also unsupported by substantial evidence. Through Dr. Cox's expert reports and uncontested testimony, the Hospice provided overwhelming evidence of many fatal problems with the sampling and extrapolation.

109.    Despite the strength of this evidence, the ALJ upheld the sampling and extrapolation. In doing so, the ALJ ignored several of Dr. Cox's key conclusions, including but not limited to his conclusion that the sample was not a probability sample as defined in MPIM § 8.4.2. In addition, the ALJ listed the eight "major steps" in the process as outlined in 8.4.1.3 and then described what the auditor did, often without analyzing whether the auditor did in fact perform the step (e.g., whether the OIG "[p]erform[ed] the appropriate assessment(s) to determine whether the sample size [was] appropriate for the statistical analyses used," whether the OIG "[e]xamin[ed] each of the sampling units and determin[ed] if there was…an underpayment"). The ALJ also made blatantly incorrect statements (e.g., writing that Dr. Cox "allege[d] that there was no evidence this statistical sample used RAT-STATS software" when Dr. Cox alleged that the OIG did not use RAT-STATS—or any other statistical software or methodology—"to estimate the size of its sample"). These and other errors show that the Decision's conclusions regarding the statistical sampling and extrapolation were unsupported by substantial evidence.

110.    Because the ALJ's Decision was not supported by substantial evidence, it should be reversed.

### COUNT II: VIOLATION OF THE MEDICARE PROGRAM INTEGRITY MANUAL

111.    The Hospice hereby incorporates by reference paragraphs 1 through 110 herein.

112.    The MPIM intends auditors to base their statistical sampling and extrapolation methodology on generally accepted statistical principles as well as the MPIM.

113.    The Defendant violated generally accepted statistical principles and the MPIM in multiple ways, including without limitation:

    a.    Neither the OIG nor CMS has indicated that either agency made a determination of a sustained or high level of payment error before the audit began. Rather, the

Defendant decided to extrapolate *before* making a determination of a sustained or high level of payment error, violating MPIM § 8.4.1.2 (as well as Section 1893(f)(3) of the Act). In addition, the Defendant may not extrapolate in the same review that supposedly determines a high level of error. As MPIM § 8.4.1.4 states, extrapolation cannot be used until there has been a "*previous*… review" showing a high error rate (emphasis added);

b.  The statistical sampling was invalid because it did not result in a probability sample. The OIG failed to produce any evidence showing that it decided how to order the claims within the sampling frame or chose the random number seed *before* beginning the sampling process. As a result, neither each sample nor each unit of each sample had "a known probability of selection" when sampling began, as required by generally accepted statistical principles and MPIM § 8.4.2. Because it did not result in a probability sample, the sampling was invalid;

c.  By failing to produce evidence that all the parameters needed to produce the sample were chosen before sampling began, auditors can run multiple samples and choose the one likely to generate the highest overpayment estimate. In such circumstances, providers would be highly unlikely to be able to detect and prove such activity;

d.  The OIG removed all claims paid zero dollars from the universe. Statistically, exclusion of zero-paid claims served only to artificially inflate the overpayment estimate. This also violated the many sections of the MPIM that require auditors to net underpayments against overpayments when estimating the total overpayment amount;

e. Instead of using statistical software or considering multiple factors to determine an appropriate sample size, the OIG arbitrarily chose a sample size of 100—the same sample size that the OIG has used in at least seven other audits reviewed by Dr. Cox. Choosing a sample size without undertaking any analysis to determine whether the sample size is adequate violates generally accepted statistical principles. It also violated MPIM § 8.4.1.3, which states that one of the "major steps" in statistical sampling is "[p]erforming the appropriate assessment(s) to determine whether the sample size is appropriate for the statistical analyses used." Further, it violated MPIM § 8.4.4.3's specific directive not to "specify a minimum sample size that applies to all situations;" and

f. The OIG's selection of an inadequate sample size resulted in an unacceptably high (poor) precision of 42.04% by the time of the Decision. This means that, in the event the Hospice is asked to reimburse more than it has been overpaid, it will be asked to over-reimburse more than four times the amount it would have been asked to reimburse had the precision been a more standard 10%. Since the Decision, the precision has worsened even further, to 53.31%.

114. Because of the Defendant's multiple, serious violations of generally accepted statistical principles and the MPIM, the Decision should be reversed.

## COUNT III: VIOLATION OF THE SOCIAL SECURITY ACT

**The ALJ Failed to Limit the Hospice's Liability as Required by Section 1879(a) and (g)(2).**

115. The Hospice hereby incorporates by reference paragraphs 1 through 114 herein.

116. Section 1879(a) and (g)(2) of the Act limit the Hospice's liability for any alleged overpayments.

117. Section 1879 provides financial relief to beneficiaries, providers, practitioners, and other suppliers who acted in good faith in accepting or providing services found to be not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. *See* Medicare Financial Management Manual, CMS Pub. 100-06, Ch. 3 § 70.1.

118. The protection afforded under Section 1879 was expanded in 1997 specifically to guard hospice beneficiaries and providers from liability arising from "incorrect" diagnoses of terminal illness in cases where the beneficiary and/or provider "did not know and could not reasonably have been expected to know" that the diagnoses were incorrect. *See* 42 U.S.C. §§ 1395pp(a) and (g)(2); *see also* Cong. Rec. E1084 (June 3, 1997).

119. The ALJ's Decision fails to properly interpret and apply the limitation of liability provision of Section 1879(a) and (g)(2) in that the ALJ concluded that the Hospice knew or should have known that the services it provided to the patients at issue would not be covered by Medicare (*i.e.*, that the patients were not terminally ill or were ineligible for a higher level of care) simply because the Hospice "is a provider, and is presumed to have knowledge of Medicare rules and procedures."

120. Therefore, the ALJ's Decision should be reversed, and this Court should rule that the Hospice is entitled to the limitation of liability for the full value of the denied claims.

## COUNT IV: VIOLATION OF THE SOCIAL SECURITY ACT

**The ALJ Failed to Waive the Alleged Overpayment as Required by Section 1870.**

121. The Hospice hereby incorporates by reference paragraphs 1 through 120 herein.

122. Section 1870 of the Act waives the Hospice's liability for the alleged overpayment.

34

123.    Under Section 1870, a provider is "without fault" if it "exercised reasonable care in billing for, and accepting, the payment" (*i.e.*, it had a reasonable basis for assuming that the payment was correct). *See* Medicare Financial Management Manual, CMS Pub. 100-06, Ch. 3 § 90.

124.    The ALJ's Decision does not explain how the Hospice was unreasonable in assuming that the services were reasonable and necessary and the payments correct. Specifically, the ALJ neglected to explain how access to or knowledge of "the pertinent statutes, regulations, coverage determinations, coding rules, and Medicare manuals" equates to knowledge that the specific patients at issue were not terminally ill or were ineligible for a higher level of care—a determination that requires the clinical judgment of a physician, rather than the application of any CMS rule or guidance.

125.    As a matter of law and fact, the Hospice is "without fault," and its liability must be waived as to all denied claims.

## COUNT V: VIOLATION OF THE SOCIAL SECURITY ACT

### The Use of Extrapolation Violated Section 1893(f)(3).

126.    The Hospice hereby incorporates by reference paragraphs 1 through 125 herein.

127.    The Defendant's use of extrapolation violated Section 1893(f)(3) of the Act. The Defendant did not make a determination that there was a "sustained or high level of payment error" before deciding to extrapolate. In fact, the OIG tacitly admitted as much. In its final report, the OIG stated, "the MPIM requirement that a determination of a sustained or high level of payment error must be made before extrapolation applies only to Medicare contractors—not the OIG." *Medicare Hospice Provider Compliance Audit: Hospice of Palm Beach County, Inc.* 16 (September 2022).

128.    Although the MPIM states that "audits or evaluations conducted by the OIG" are one possible criterion that may be used to determine a sustained or high level of payment error," this blatantly conflicts with the statute. The simple fact that the OIG is performing a review cannot establish that a payment error is high.

129.    The payment error rate in this audit is well below the 50% threshold that Defendant has set.

130.    Because the use of extrapolation violated Section 1893(f)(3) of the Act, this Court should declare that the extrapolation was statutorily unauthorized and should enjoin the Defendant from using extrapolation in this case.

## COUNT VI: VIOLATION OF THE HOSPICE'S DUE PROCESS RIGHTS UNDER THE U.S. CONSTITUTION

**The Prohibition Against Review Violates the Hospice's Due Process Rights.**

131.    The Hospice hereby incorporates by reference paragraphs 1 through 130 herein.

132.    The Hospice has a protected property interest because it is entitled to payments for services that met the federal hospice Conditions of Payment.

133.    CMS (through Ruling 86-1), the Council, and this Court have acknowledged that statistical sampling and extrapolation implicate providers' due process rights.

134.    The prohibition against administrative and judicial review of HHS's determination that there has been a sustained or high level of payment error, as set forth in Section 1893(f)(3) of the Act and MPIM § 8.4.1.2, deprives the Hospice of an appropriate level of process. Extrapolation vastly multiplies overpayment estimates—as well as any unresolved errors the auditor has made. Thus, the Hospice faces a tremendous risk that it will be erroneously deprived of funds to which it is entitled if the sole determination that authorizes the extrapolation is unreviewable.

135.     Therefore, this statutory and agency prohibition against review violates the Hospice's due process rights under the U.S. Constitution.

136.     Because the prohibition against review violates providers' due process rights, this Court should declare that the prohibition against review of the Defendant's determination of a high level of payment error, which is set forth in Section 1893(f)(3) and MPIM § 8.4.1.2, violates the due process clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution. Moreover, this Court should enjoin the Defendant from using extrapolation in this case.

## COUNT VII: VIOLATION OF THE HOSPICE'S DUE PROCESS RIGHTS UNDER THE U.S. CONSTITUTION

**The Decision to Use Extrapolation Violated the Hospice's Due Process Rights.**

137.     The Hospice hereby incorporates by reference paragraphs 1 through 136 herein.

138.     The Defendant's decision to use extrapolation violated the Hospice's due process rights because the Defendant decided to use extrapolation *before* making a determination of a sustained or high level of payment error. This decision deprived the Hospice of an appropriate level of process because it permitted the Defendant to decide to extrapolate for any reason or for no reason at all. Thus, the Hospice is highly likely to be erroneously deprived of funds to which it was entitled.

139.     Because the Defendant decided to extrapolate before making a determination of a sustained or high level of payment error, this Court should declare that the Defendant violated the Hospice's due process rights and should enjoin the Defendant from using extrapolation in this case.

## COUNT VII: VIOLATION OF THE HOSPICE'S DUE PROCESS RIGHTS UNDER THE U.S. CONSTITUTION

**The Exclusion of Claims Paid Zero Dollars Violated the Hospice's Due Process Rights.**

140.     The Hospice hereby incorporates by reference paragraphs 1 through 139 herein.

141.     The Defendant's exclusion of all claims paid zero dollars violated the Hospice's due process rights. Excluding such claims serves no purpose other than to artificially inflate the overpayment estimate. The exclusion of these claims placed the Hospice at tremendous risk of being erroneously deprived of funds to which it was entitled.

142.     The OIG's removal of the zero-paid claims from the universe also made it impossible for the Hospice to calculate the potential impact of the exclusion of the zero-paid claims from the sampling frame. This prevents the Hospice from being able to demonstrate to administrative and judicial decision makers the potentially severe magnitude of the harm inflicted by the agency's decision.

143.     Because the Defendant wrongfully excluded claims paid zero dollars, this Court should declare that the Defendant violated the Hospice's due process rights and reverse the ALJ's Decision that the sampling and extrapolation were valid.

### COUNT VIII: VIOLATION OF THE HOSPICE'S DUE PROCESS RIGHTS UNDER THE U.S. CONSTITUTION

**The Multiple Fatal Statistical Errors Violated the Hospice's Due Process Rights.**

144.     The Hospice hereby incorporates by reference paragraphs 1 through 143 herein.

145.     The Defendant's failure to adhere to generally accepted statistical principles and its significant departures from its own guidance, the MPIM, violated the Hospice's due process rights.

146.     The Defendant decided to extrapolate before determining that there was a high level of payment error, ensured an artificially inflated overpayment by excluding claims paid zero dollars, chose the sample size arbitrarily and without undertaking any analysis, used a statistically invalid sample (i.e., not a probability sample), and then used the results to perform the unauthorized extrapolation the Defendant had planned to use from the beginning. Under any one

of these circumstances, the Hospice's risk of being erroneously deprived of funds to which it was entitled was terribly high.

147.    As a result of the Defendant's many fatal failures to adhere to generally accepted statistical principles and the MPIM, this Court should declare that the Defendant violated the Hospice's due process rights and reverse the ALJ's Decision that the sampling and extrapolation were valid.

## **REQUEST FOR RELIEF**

**WHEREFORE**, the Hospice respectfully requests that this Court:

148.    Find the ALJ's Decision applied the wrong legal standards;

149.    Find the ALJ's Decision was not supported by substantial evidence;

150.    Reverse the ALJ's Decision that the remaining denied claims did not meet Medicare coverage guidelines for hospice services;

151.    Reverse the ALJ's Decision that the sampling and extrapolation were valid;

152.    Declare that extrapolation was statutorily unauthorized in this case;

153.    Enjoin the Defendant from using extrapolation in this case;

154.    Order the Defendant to exclude the three claims denied for SIA reasons from the demand and, in the event this Court determines that extrapolation is permissible, from the extrapolation recalculation;

155.    Order the Defendant to exclude amounts otherwise payable under Medicare Part B or D from the demand and, in the event this Court determines that extrapolation is permissible, from the extrapolation recalculation;

156.    Reverse the ALJ's Decision that payment for the denied services cannot be made in accordance with Section 1879 of the Act;

157.    Reverse the ALJ's Decision that recoupment of the alleged overpayment cannot be waived in accordance with Section 1870 of Act;

158.    Declare that Section 1893(f)(3)'s prohibition against review of the Defendant's determination of a high level of payment error violates the due process clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution;

159.    Declare that the Defendant violated the Hospice's due process rights under the U.S. Constitution.

160.    Hold that the Hospice is entitled to reimbursement for the claims submitted relating to Medicare that form the basis of this Complaint; and

161.    Grant the Hospice any other legal or equitable relief that the Court may deem just and proper.

Date: August 8, 2024.

**HUSCH BLACKWELL LLP**

*/s/ Erica Conklin Baines*
Erica Conklin Baines
Florida Bar No. 58121
120 S. Riverside Plaza, Suite 2200
Chicago, IL 60606
Phone: 312.526.1551
Fax: 312.655.1501
Erica.baines@huschblackwell.com

***Attorney for Hospice of Palm Beach County, Inc.***